IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 07-cv-02351-PAB-KLM
(Consolidated with 07-cv-02412; 07-cv-02454; 07-cv-02465; and 07-cv-02469)

In re Crocs, Inc. Securities Litigation

---

### ORDER

---

This matter is before the Court on the Motion for Final Approval of the Proposed

Partial Settlement, Plan of Allocation, and Final Certification of Settlement Class

[Docket No. 206] filed by Plaintiffs.[1]  This Court has subject matter jurisdiction pursuant

to the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa *et seq.*,

and 28 U.S.C. § 1331.

## I. BACKGROUND

### A.  Procedural History

On or after November 8, 2007, five purported class actions were filed in this

District alleging that Crocs, Inc., four of its executive officers, two members of its senior

management, four members of its board of directors (collectively "Crocs" or the "Settling

Defendants"), and Crocs' auditor and principal accounting firm, Deloitte & Touche, LLP

("Deloitte"), violated the Exchange Act and rules promulgated by the Securities and

Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-1 *et seq.  See Dhingra v. Crocs,

Inc.*, No. 07-cv-2351-REB; *Muller v. Crocs, Inc.,* No. 07-cv-02412-MSK; *Swanson v.*

---

[1]Terms used in this order have the meaning set forth in the parties' Stipulation
and Agreement of Partial Class Settlement [Docket No. 194] unless otherwise
indicated.

*Crocs, Inc.*, No. 07-cv-02454-EWN; *Hutchinson v. Crocs, Inc.*, No. 07-cv-02465-WYD; and *Stewart v. Crocs, Inc.*, No. 07-cv-02469-DME.  On December 19, 2007, the Court consolidated the five actions into the present case.  Docket No. 9.

On September 17, 2008, the Court appointed Antonio Pedrera Sanchez and Fernando Pedrera Sanchez (the "Sanchez Group") as Lead Plaintiff.[2]  *See* Docket No. 67.  After its appointment as Lead Plaintiff, on December 31, 2008, the Sanchez Group filed a consolidated class action complaint [Docket No. 87] on behalf of a putative class comprised of individuals who purchased Crocs securities between April 2, 2007 and April 14, 2008, inclusive.  Docket No. 87 at 1.  The amended complaint added Harvey Babbitt and Daniel J. Lundberg as named plaintiffs in the putative class action.  *Id*.  In the amended complaint, plaintiffs alleged that Crocs made materially false and misleading public statements about its inventory and the systems Crocs used to manage its inventory, which led to plaintiffs' damages as the price of Crocs' securities decreased once Crocs made corrective disclosures.  *See, e.g.,* Docket No. 87 at 36-123, ¶¶ 113-169.

On March 19, 2009, Crocs and Deloitte filed motions to dismiss.  Docket Nos. 103, 107, 108.  On February 28, 2011, the Court dismissed the consolidated complaint with prejudice for failure to state a claim upon which relief may be granted.  Docket No. 167.  On March 18, 2011, plaintiffs appealed the Court's order dismissing the case.

---

[2]The Court appointed the Sanchez Group as Lead Plaintiff because it had the "largest financial interest in the litigation."  Docket No. 67 at 6.  The Court rejected arguments raised by the other plaintiffs challenging the Sanchez Group's ability to represent the putative class because it found that contracts for difference ("CFDs") qualify as securities under the Exchange Act and, therefore, the Sanchez Group was not an atypical plaintiff and was not subject to unique defenses.  *Id*. at 6-9.

Docket No. 169.[3]  The parties completed appellate briefing on December 29, 2011.

### B.  Settlement Negotiations

Beginning on April 27, 2011, Plaintiffs and the Settling Defendants engaged in settlement negotiations.  Docket No. 208 at 25.  While the case was on appeal, the parties' negotiations were conducted with the assistance of Kyle Ann Schultz, the Tenth Circuit Mediator.  In addition, the parties engaged in mediation before retired United States District Judge Layn R. Phillips, who has extensive experience mediating complex cases.  *Id.* at 26.  During mediation, Lead Plaintiff prepared detailed mediation statements and worked with a damages expert.  *Id.* at 26-27.   Following months of supervised mediation, Lead Plaintiffs and Crocs (the "Settling Parties") reached a settlement agreement, finalized over a two month period during which the parties discussed their respective claims and defenses, as well as key factual issues in the litigation.[4]  Docket No. 195 at 4.  Upon reaching a settlement agreement, the Settling Parties notified the Tenth Circuit and requested that the Tenth Circuit remand the case.  *Id*.  On April 9, 2012, the Tenth Circuit remanded the case "on a limited basis" so that this Court could "consider fully the parties' proposed class settlement."  Docket No. 187 at 2-3.

---

[3] Plaintiffs' appeal is captioned *Sanchez v. Crocs, Inc., et al.*, Case No. 11-1116.

[4] Deloitte & Touche, LLP is not a party to the proposed settlement agreement and takes no position on the requested relief.  Docket No. 206 at 1, n.3.

### C.  The Settlement Agreement and Plan of Allocation[5]

The Settling Parties seek certification of a Settlement Class consisting of:

all Persons who purchased or otherwise acquired publicly traded
securities of Crocs between April 2, 2007 and April 14, 2008, inclusive.
Excluded from the Settlement Class are Defendants, their officers and
directors during the Settlement Class Period, the members of their
immediate families, and their respective representatives, heirs,
successors, and assigns, as well as any entity in which Defendants have
or had a controlling interest.  Also excluded from the Settlement Class are
those Persons who otherwise satisfy the above requirements for
membership in the Settlement Class, but who timely and validly request
exclusion from the Settlement Class pursuant to the Notice to be sent to
Settlement Class Members.

Docket No. 194 at 11, ¶ 1.32; Docket No. 206 at 10.  There are no subclasses to the

Settlement Agreement.  Plaintiffs also seek appointment of Fernando Pedrera

Sanchez, Harvey Babitt, and Daniel Lundberg as class representatives.  Docket No.

206 at 10.

In exchange for full release of Settlement Class claims relating to the underlying

lawsuit, Crocs will pay the Settlement Amount, $10,000,000.00, into a Settlement Fund.

Docket No. 194 at 11, ¶¶ 1.31, 1.35.  The Settlement Amount will be provided by Crocs'

Directors and Officers' insurers ("D&O Insurers").  Docket No. 194 at 6, ¶ 1.11.  Lead

Plaintiff may use up to $250,000.00 from the Settlement Fund for costs and expenses

reasonably, necessarily, and actually incurred to provide the Settlement Class with

notice.  Docket No. 194 at 16-17, ¶ 3.7.  Depending on the number of eligible Class

Members who participate in the settlement, the estimated average recovery will be

_____

[5]The Stipulation and Agreement of Partial Class Settlement (the "Stipulation")
[Docket No. 194] sets forth the settlement agreement in its entirety and the Court will
restate only those portions relevant to resolving the instant motion.

approximately $0.13 per share of Crocs' common stock before deduction of Court-approved fees and expenses.  Docket No. 208 at 65.

After deducting attorneys' fees,[6] costs of notice, expenses, and costs for claims administration, the Settlement Fund will be allocated pro rata among the Settlement Class based on the following factors: (1) the date class members purchased securities; (2) the type of security purchased; (3) the first-in, first-out ("FIFO") method of recognized loss;[7] and (4) the Recognized Claim formula.[8]  Docket No. 208 at 67-71.

To recover damages as a member of the Settlement Class, a class member was required to return a valid proof of claim form.  *Id.* at 77.  The class members were also given the opportunity to opt out of the Settlement Agreement or file objections.  *Id.* at

---

[6]The Court-approved attorneys' fees for lead counsel are not to exceed 33 1/3% of the Settlement Fund.  Docket No. 194 at 27.

[7]For Settlement Class Members who held Crocs securities at the beginning of the Settlement Class Period or made multiple purchases or sales during the Settlement Class Period, the first-in, first-out ("FIFO") method will be applied.  Under FIFO, sales of securities during the Settlement Class Period will be matched, in chronological order, first against securities held at the beginning of the Settlement Class Period.  The remaining sales of securities during the Settlement Class Period will then be matched, in chronological order, against securities purchased during the Settlement Class Period.  Docket No. 208 at 70.

[8]The Recognized Claim formula is not an estimate of the amount that a Settlement Class Member might have been able to recover after a trial; nor is it an estimate of the amount that will be paid to Authorized Claimants pursuant to the Settlement.  Rather, the Recognized Claim formula is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants based upon several factors, including when a Settlement Class Member purchased Crocs securities during the Class Period, when or if a Settlement Class Member sold those Crocs securities, and Plaintiffs' Counsel's estimation, based on consultation with Plaintiffs' experts, of the relative strengths and weaknesses of the Settlement Class claims and the impact of the alleged misconduct by the Settling Defendants on the price of Crocs' securities at various times during the Settlement Class Period.  Docket No. 195-2 at 15.

71-72.  Any settlement class member who failed to submit a timely proof of claim form will not receive payment pursuant to the Settlement Agreement.  Moreover, a qualifying class member will not receive a distribution from the Settlement Fund if the class member is entitled to recover less than $10.00.  *Id.* at 70.

The Claims Administrator will calculate the claims submitted by the settlement class members and oversee distribution of the Settlement Fund.  Docket No. 194 at 24, ¶ 6.1.  If there is a balance remaining in the Settlement Fund after all claims, fees, costs, and taxes are paid, the remaining balance shall be reallocated and distributed among the class members who can receive at least $10.00 from such re-distribution.  Docket No. 194 at 26, ¶ 6.2(c).  Thereafter, any remaining balance shall be donated – subject to Court approval – to St. Jude Children's Research Hospital.  *Id.*  No part of the Settlement Fund shall revert to defendants.[9]  *Id.*

The Stipulation provided for notice to potential class members.  Docket No. 194 at 7; *see also* Docket No. 208 at 65-85.  Identification of potential class members was to occur primarily based upon record holder data provided by Crocs' transfer agent and by direct mailing to broker-dealers to gather last known names and addresses of potential shareholders.  Plaintiffs also indicated that the Summary Notice would be published three staggered times via press releases issued over business-oriented news wires.

---

[9]Such a distribution is known as a *cy pres* distribution.  *See In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 172 (3d Cir. 2013).  *Cy pres* distributions are usually awarded when excess settlement funds remain after class members have received distribution of the settlement agreement.  *Id.*  Several courts of appeals have held that a district court does not abuse its discretion by including a *cy pres* component in a settlement agreement.  *Id.* (listing cases).

**D. Preliminary Approval**

On May 14, 2012, plaintiffs moved for preliminary approval of the proposed partial class settlement.  Docket No. 195.  The Settling Defendants filed a brief in support of the settlement.  Docket No. 196.  On June 4, 2012, National Roofing Industry Pension Plan ("National Roofing"), a group of plaintiffs seeking appointment as Lead Plaintiff, filed objections to the proposed partial Settlement Agreement.[10]  Docket No. 197.  National Roofing raised three arguments for why the Settling Parties' proposed partial Settlement Agreement should be rejected: (1) the Sanchez Group lacks standing to function as the Lead Plaintiff in light of the Supreme Court's ruling in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010); (2) the timing of the Settlement Agreement raises serious doubts about the fairness of the class members' anticipated recovery; and (3) the Settlement Agreement is not fair, reasonable, or adequate because an estimated net recovery of $6.4 million for the Settlement Class is less than 15% of the Sanchez Group's alleged damages.  Docket No. 197 1-5; *see, e.g.*, Docket No. 26-3.

On August, 28, 2013, the Court granted preliminary approval of the proposed partial class settlement.  Docket No. 204 at 29.  Specifically, the Court found that the proposed class met the requirements of Fed. R. Civ. P. 23(a) and (b), that the settlement agreement met the requirements of Fed. R. Civ. P. 23(e), and that the

---

[10]On January 7, 2008, National Roofing moved for appointment as Lead Plaintiff, Docket No. 31, which the Court denied.  Docket No. 67.  After the Court's denial, National Roofing moved for reconsideration, Docket No. 142, which the Court denied as moot once the Court dismissed the Lead Plaintiff's amended complaint.  Docket No. 167.  National Roofing appealed the Court's denial of its motion for reconsideration, which is captioned on appeal as *National Roofing Industry Pension Plan v. Michael C. Margolis et al.*, Case No. 11-1142.

proposed notice was reasonably calculated to apprise absent class members of the action.  *Id.* at 22, 27, 29; *see also* Docket No. 205.  The Court also addressed National Roofing's objection on the issue of standing:

> Although National Roofing argues that the Sanchez Group does not have Article III standing to litigate its claims against Crocs because its members purchased CFDs that are not traded on United States stock exchanges, Docket No. 197 at 1-5, the Supreme Court in *Morrison* clarified that whether § 10(b) of the Exchange Act applied extraterritorially is not a question of subject matter jurisdiction, but rather goes to the merits of a case.  130 S.Ct. at 2877; *see Absolute Activist Value Master Fund, Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012) (noting that "the district court erred in dismissing the case for lack of subject matter jurisdiction because *Morrison* makes clear that whether § 10(b) applies to certain conduct is a 'merits' question").  Thus, although National Roofing argues that the Sanchez Group's standing is a threshold issue, the Court finds that National Roofing's objections are properly addressed within the Rule 23 class certification factors.  *Cf. NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,* 693 F.3d 145, 160-62 (2d Cir. 2012) (noting that there is "tension" in the case law regarding whether "variation" between (1) a named plaintiff's claims and (2) the claims of putative class members "is a matter of Article III standing . . . or whether it goes to the propriety of class certification pursuant to [Fed. R. Civ. P. 23(a)] . . ." and finding that, "in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants") (internal citations omitted).

Docket No. 204 at 4-5.  The Court also found that, with respect to Fed. R. Civ. P. 23(a), "National Roofing has not shown that the interests of the Sanchez Group are antagonistic to the interests of the Settlement Class."  *Id.* at 15.  With respect to the fairness of the settlement agreement, the Court noted that "National Roofing has provided no reason for the Court to conclude that the terms of the Settlement Agreement were not fairly and honestly negotiated" and invited National Roofing to file objections detailing why the proposed settlement was unfair under the Rule 23 factors.

*Id.* at 24, 27.

### E.  Notice Period and Fairness Hearing

The Notice approved by the Court provided information regarding the anticipated recovery under the partial Settlement Agreement, the outcome of the case without a settlement, the agreement on the amount of damages, reasons for the settlement, the amount of attorneys' fees or costs sought, a summary of the plan of allocation, and procedures for filing objections or opting out of the class. *See generally* Docket No. 208 at 65-85.  The Garden City Group ("Garden City") was appointed to act as Claims Administrator and to disseminate the Notice and Proof of Claim and Release (collectively, the "Claim Packet").  Docket No. 205 at 6, ¶ 8; Docket No. 218 at 1. Potential class members were identified in the following ways:

- •    The names and addresses of 163 persons or entities were provided by counsel for the Settling Defendants.

- •    Garden City's proprietary database of banks, retail brokers, clearing agents, and other potential purchasers identified the names and addresses of 2,047 persons or entities.

- •    Garden City received emails, labels and lists from individuals, brokerage firms, banks, institutions, and other nominees, which led to the mailing of 296,061 Claim Packets.

Docket No. 218 at 2-3.  From September 19, 2013 to October 21, 2013, Garden City mailed 206,524 Claim Packets to potential class members.  *Id.* at 3.  After October 21, 2013, it mailed an additional 91,747 Claim Packets.  *Id.*  In total, 298,271 Claim Packets

were mailed to potential class members.  *Id.*[11]  In addition, plaintiffs sent out press

releases over PR Newswire on September 12, 18, and 24, 2013.  Docket No. 208 at 87-

89.  Garden City also posted the Claim Packet on its website, www.gcginc.com, to

enable potential class members to download it.  Docket No. 208 at 62.

Garden City received 12 timely exclusions and one late received exclusion.

Docket No. 213 at 5; Docket No. 211.  Only two objections were filed.  One of them

came from Mr. Peter Encinosa, a Crocs investor.[12]  Docket No. 210 at 2.  Mr. Encinosa

states that he lost $13,448.02, but argues that, under the Plan of Allocation, he would

be entitled to a recognized loss of $0.  *Id.*  Mr. Encinosa, who lives in the Phillippines,

elected not to appear at the fairness hearing.  *Id.*  On November 26, 2013, National

Roofing filed an objection, arguing (1) that the Sanchez Group lacks standing and (2)

that the timing of the settlement "militates against a conclusion that the proposed

Settlement is fair, adequate, or in the best interest of class members."  Docket No. 209

at 2.

On February 13, 2014, the Court held a fairness hearing.  Docket No. 217.

---

[11]This figure includes 1,088 Claim Packets that were re-mailed to updated addresses.  *Id.*

[12]In a December 3, 2013 email to Plaintiff's Counsel, Mr. Encinosa stated: "I gather my best option would then be to remain completely EXCLUDED from any ruling related to this [case]."  Docket No. 212-1 at 2.  In the same email, Mr. Encinosa also stated that he would not withdraw his objection.  *Id.*  The Court does not regard Mr. Encinosa's email as a request to be excluded from the Settlement because, were Mr. Encinosa to be excluded, he would not be able to maintain his objection to the Settlement.  Second, if Mr. Encinosa wished to be excluded from the Settlement, he was required to provide notice to the Claims Administrator by November 26, 2013, which he failed to do.  The Court will consider Mr. Encinosa's objection rather than exclude him from the Settlement Class.

Counsel for Plaintiffs, the Settling Defendants, and Deloitte were present.  No objecting members of the Settlement Class appeared at the hearing.

Plaintiffs now move for final approval of the Settlement and request that the Court grant (1) final certification of the Settlement Class; (2) final approval of the proposed Settlement as set forth in the Stipulation; (3) final approval of the Plan of Allocation; and (4) final approval of the Notice sent to the Settlement Class.

## II.  OBJECTIONS

### A.  Mr. Encinosa

Mr. Encinosa claims that he incurred losses as a "direct consequence of the misleading statements made by the Defendants about Crocs, Inc.," yet would not be entitled to recover for those losses under the Plan of Allocation.  Docket No. 210 at 2.  Plaintiffs respond that, because Mr. Encinosa bought and sold his Crocs shares between Crocs' corrective disclosures, his shares are deemed, under the Plan of Allocation, to have lost value for reasons unrelated to any corrective disclosure.  Docket No. 212 at 4.  The Court agrees and overrules Mr. Encinosa's objection.  *See Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005) ("[T]he inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value . . . .  But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss . . . .  When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances . . . or other events . . . .").

### B.  National Roofing

As a threshold matter, National Roofing's objection failed to comply with the Court's order directing that each written objection to the Settlement include "a representation as to whether such Person or entity intends to appear to be heard at the Settlement Hearing [and] proof of all purchases, acquisitions or sales of Crocs securities during the Settlement Class Period."  Docket No. 205 at 10.  Thus, National Roofing's objection is deemed waived and National Roofing "shall forever be foreclosed from making any objection to the fairness or adequacy of the proposed Settlement."  *Id.* at 11.  Moreover, National Roofing's objections to final approval of the Settlement essentially reiterate two of the arguments it advanced in its objection to preliminary approval of the Stipulation: (1) that the Sanchez Group lacks standing and (2) that the timing of the settlement suggests that the settlement may not be fair or adequate.  *Compare* Docket No. 209 at 2-3, *with* Docket No. 197.  The Court has already addressed both arguments at length, *see generally* Docket No. 204[13]; and National Roofing presents no new facts or legal authority that would compel a different conclusion.  Nonetheless, the Court will briefly address National Roofing's arguments.

National Roofing argues that the Sanchez Group lacks standing because the Sanchez Group claims losses from the purchase of contracts for difference ("CFDs"), which it argues are securities which do not give rise to a § 10(b) claim.  Docket No. 209 at 3.  Although National Roofing's objection is presented as a challenge to the Sanchez Group's standing, the Court does not construe National Roofing's objection as an attack

---

[13]The Court incorporates by reference its discussion of these arguments in its order preliminarily approving the Settlement.  *See id.*

on the Sanchez Group's Article III standing.[14]   National Roofing relies on *Morrison v.*

*Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), in support of its argument, but fails to

address a key portion of the *Morrison* opinion.   Whether a plaintiff has a cause of action

under § 10(b) does not, strictly speaking, implicate a court's subject matter jurisdiction

over a case.   *Id.* at 254; *see also Absolute Activist Value Master Fund, Ltd. v. Ficeto*,

677 F.3d 60, 67 (2d Cir. 2012) (noting that "the district court erred in dismissing the

case for lack of subject matter jurisdiction because *Morrison* makes clear that whether

§ 10(b) applies to certain conduct is a 'merits' question").[15]

---

[14]National Roofing does not dispute that the Sanchez Group suffered losses from its purchase of CFDs, which were securities matched by shares of Crocs common stock.   Docket No. 209 at 3; *see also* Docket No. 25 at 9 (estimating Sanchez Group's losses at $34,512,709).   The Court is otherwise satisfied that Plaintiffs have made the required showing to meet the requirement of Article III standing.   *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that constitutional standing requires a plaintiff to show that (1) he has suffered an "injury in fact"; (2) there is a causal connection between his injury and the alleged conduct; and (3) it is likely that his injury "will be redressed by a favorable decision").   Even assuming that the Sanchez Group lacked Article III standing, National Roofing does not argue that named plaintiffs Babbitt and Lundberg lack standing.   Thus, the Court is satisfied that it has Article III subject matter jurisdiction.

[15]In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1386-87 (2014), the Supreme Court distinguished between Article III standing and what is commonly referred to as prudential or statutory standing.   "Prudential standing" is not exhaustively defined, but encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances . . . , and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."   *Id.* (quotation marks omitted).   However, the Court held that whether a plaintiff's claim falls within the zone of interests is not properly considered a question of standing because a zone of interests analysis requires a Court to determine, "using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."   *Id.* at 1387.   Thus, the term "prudential standing" "is a misnomer as applied to the zone-of-interests analysis, which asks whether this particular class of persons ha[s] a right to sue under this substantive statute."   *Id.* (quotation marks omitted).   So, too, is the term "statutory standing," which "is misleading, since 'the absence of a valid (as opposed to arguable)

In *Morrison*, the Supreme Court held that § 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), does not apply extraterritorially.  561 U.S. at 265.  Instead, the

Supreme Court held that "[s]ection 10(b) reaches the use of a manipulative or deceptive

device or contrivance only in connection with the purchase or sale of a security *listed on*

*an American stock exchange*, and the purchase or sale of any other security *in the*

*United States*."  *Id.* at 273 (emphasis added).  However, the Court clarified that the

question of § 10(b)'s extraterritorial reach does not implicate subject matter jurisdiction:

> to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits,
> which is a merits question.  Subject matter jurisdiction, by contrast, refers to
> a tribunal's power to hear a case.  It presents an issue quite separate from
> the question whether the allegations the plaintiff makes entitle him to relief.

*Id.* at 254 (citations and quotation marks omitted)[16]; *see also Absolute Activist*, 677 F.3d

at 67.  The Court further emphasized that the extraterritorial reach of § 10(b) was a

question properly resolved under Fed. R. Civ. P. 12(b)(6), not Rule 12(b)(1).  *Morrison*,

561 U.S. at 254.

Here, it is undisputed that CFDs qualify as securities.  *See, e.g., S.E.C. v.*

---

cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory
or constitutional *power* to adjudicate the case.'"  *Id.* at 1387 n.4 (citation omitted)
(quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642-43 (2002)).
Notwithstanding those commonly used labels, the relevant inquiry is whether plaintiff
"falls within the class of plaintiffs whom Congress has authorized to sue," or, in other
words, whether plaintiff "has a cause of action under the statute."  *Id.* at 1387; *see also*
*Morrison*, 561 U.S. at 255 (determining that extraterritorial reach of § 10(b) was a
question properly resolved under Fed. R. Civ. P. 12(b)(6), not Rule 12(b)(1)).

[16]In doing so, the Court "correct[ed] a threshold error in the Second Circuit's
analysis.  [The Second Ciriucit] considered the extraterritorial reach of § 10(b) to raise a
question of subject-matter jurisdiction."  *Id.* at 253.

*Compania Internacional Financiera, S.A.*, 2011 WL 3251813, at *6-7 (S.D.N.Y. July 29,

2011); *In re Optimal U.S. Litig.*, 865 F. Supp. 2d 451, 453 (S.D.N.Y. 2012).  Moreover, it

is undisputed that the Sanchez Group purchased CFDs outside of the United States.

*See* Docket No. 41-3.  Thus, the only question centers on whether the Sanchez Group

can show that the CFDs it purchased from Saxo Bank qualify as a "purchase or sale of

a security listed on an American stock exchange" – a question which goes to the merits

and does not implicate subject matter jurisdiction.  *See Morrison*, 561 U.S. at 273.

Thus, rather than being a threshold issue, as National Roofing argues, National

Roofing's objection is properly construed as an argument that the Sanchez Group

cannot state a claim under § 10(b).  Although the Sanchez Group's purchase of CFDs

may make it subject to a defense that is atypical of the Settlement Class, this does not,

by itself, defeat class certification.  National Roofing again fails to show that the

interests of the Sanchez Group are antagonistic to the interests of the Settlement

Class.  Rather, as fully discussed below, the Sanchez Group has sought to maximize

recovery and there is no indication that the Sanchez Group's ability to represent the

interests of absent class members is compromised such that the Court should deny

class certification.[17]  Accordingly, for the foregoing reasons, the Court overrules

---

[17]National Roofing also fails to explain how named plaintiffs Babbitt and
Lundberg would be unable to represent the interests of the Settlement Class in the
event that the Sanchez Group was subject to a lack of standing defense.  The Private
Securities Litigation Reform Act ("PSLRA"), among other things, requires that a district
court appoint a person or persons to serve as lead plaintiff of a putative class before the
court proceeds with the adjudication of a private lawsuit under the federal securities
laws.  *See* 15 U.S.C. § 78u-4(a)(3).  However, "[n]othing in the PSLRA indicates that
district courts must choose a lead plaintiff with standing to sue on every available cause
of action."  *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004).  Rather, "because
the PSLRA mandates that courts must choose a party who has, among other things,

National Roofing's objection on the issue of standing.

The Court turns to National Roofing's objection concerning the fairness of the Settlement.  National Roofing fails to provide any new basis upon which to question the fairness of the Settlement, but rather reiterates its suggestion that the timing of the settlement – "[o]n the eve of a hearing before the Tenth Circuit Court of Appeals addressing this Court's dismissal of the action" – casts doubt on the fairness of the Settlement.  Docket No. 209 at 2.  National Roofing does not explain why the Settlement is unfair or indicate how a better result may have been achieved.  Rather, Plaintiffs were faced with the possibility that the Tenth Circuit would uphold this Court's order dismissing the complaint.  Even if plaintiffs prevailed at the Tenth Circuit, plaintiffs were not assured of success on the merits.  Moreover, the mediators who assisted the parties were experienced and sophisticated, and the Court has no reason to believe that the mediators were unaware of the timing of the settlement and the implications thereof.  The fairness of the Settlement is discussed below in more detail.  National Roofing fails to present evidence or argument which would otherwise cast significant

---

the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim." *Id*.  In such cases, district courts allow putative class suits to proceed so long as there is at least one named plaintiff with standing to sue as to every claim alleged. *See Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 112 (2d Cir. 2013).  It is undisputed that plaintiffs Babbitt and Lundberg are members of the proposed Settlement Class.  Docket No. 197 at 9; Docket No. 198 at 3.  National Roofing's objection fails to take this fact into account.

National Roofing also argues that the Sanchez Group is not a class member because it sold all of its Crocs' common stock before Crocs made corrective disclosures.  Docket No. 197 at 6-7.  Because the addition of plaintiffs Babbitt and Lundberg to this action cures concerns regarding the class representatives' purchases of Crocs' common stock, the Court need not address this argument in resolving the instant motion.

doubt on the fairness of the Settlement.  National Roofing's objection on this issue is overruled.

## III.  CLASS CERTIFICATION

District courts have broad discretion when deciding whether to certify a putative class.  *Wal-Mart Stores, Inc. v. Dukes*, --- U.S. ----, 131 S.Ct. 2541, 2551 (2011); *Shook v. El Paso Cnty.*, 386 F.3d 963, 967 (10th Cir. 2004).  A district court may only certify a settlement class if it is "satisfied, after a rigorous analysis" that the requirements of Rule 23 are met.  *Dukes*, 131 S.Ct. at 2551.  Frequently, a district court's "'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Id.*; *see also In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (holding that "the obligation to make [Rule 23] determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement").

As the party seeking class certification, plaintiffs have the burden to prove that the requirements of Rule 23 are satisfied.  *Shook*, 386 F.3d at 968.  Plaintiffs must first demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d. Cir. 2011).

After meeting these requirements, plaintiffs must demonstrate that the proposed

class action fits within one of the categories described in Fed. R. Civ. P. 23(b).  Here,

plaintiffs ask the Court to certify a settlement class under Rule 23(b)(3).  Docket No.

206 at 12.  Under that provision, plaintiffs must show that "questions of law or fact

common to class members predominate over any questions affecting only individual

members" and that a class action "is superior to other available methods for fairly and

efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In determining

predominance and superiority under Rule 23(b)(3), the Court considers the following

factors: (A) the class members' interests in individually controlling the prosecution or

defense of separate actions; (B) the extent and nature of any litigation concerning the

controversy already begun by or against class members; (C) the desirability or

undesirability of concentrating the litigation of the claims in the particular forum; and (D)

the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).  To

certify a settlement class, the Court need not inquire whether the case, if tried, would

present difficult management problems under Rule 23(b)(3)(D).  *Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 620 (1997).  However, all of the other Rule 23 requirements

apply and demand heightened attention in the settlement context because the Court

generally lacks an opportunity to adjust the class as the case unfolds.  *Id*.

### A.  Numerosity

Rule 23(a)(1) requires that the class membership be sufficiently large to warrant

a class action because the alternative of joinder is impracticable.  Fed. R. Civ. P.

23(a)(1).  Some courts have held that numerosity may be presumed at a certain

number; however, the Tenth Circuit has never adopted a minimum presumption.

*Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (upholding district court ruling that a group of eighty-four class members was insufficient to warrant class certification). Moreover, the Settling Parties submit that hundreds, if not thousands, of individuals or entities purchased Crocs shares during the relevant time period. Although the Settling Parties do not provide an estimate of the number of individuals that qualify for the relevant class, Garden City, as of February 20, 2014, had received approximately 29,400 claims. Docket No. 218 at 4. Although many of the submitted claims may be deficient for various reasons, *id.*, the Court finds it likely that the number of individuals that qualify for the relevant class will be in the thousands. Thus, the Court finds that the proposed Settlement Class satisfies Rule 23(a)(1)'s numerosity requirement.

### B.  Commonality

Rule 23(a) requires a district court to ensure that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Factual differences in the claims of the individual class members should not result in the denial of class certification where common questions of law exist. *D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010) ("Factual differences between class members' claims do not defeat certification where common questions of law exist") (citation omitted). The commonality requirement asks only that the lead plaintiff demonstrate that the class members have "suffered the same injury" such that the claims of the class are based on a common contention and that the determination of the truth or falsity of this contention "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. In other words, plaintiffs must have a common

question of fact or law that will connect many individual claims to the relief sought by the class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). Even one common issue of law or fact will suffice to establish Rule 23's commonality requirement. *Dukes*, 131 S.Ct. at 2556.

In this case, plaintiffs allege that defendants recklessly or knowingly made material misrepresentations or omissions regarding Crocs' inventory that artificially inflated the price of Crocs' securities and led to the Settlement Class' damages. Docket No. 195 at 12. These issues of fact and law are common to all plaintiffs' claims arising under the Exchange Act. Thus, although the alleged material misrepresentations and omissions may have impacted class members differently, whether these material omissions and misrepresentations occurred is a factual and legal question that is common to the entire class and is capable of class wide resolution. *Dukes*, 131 S.Ct. at 2556. Accordingly, the Court finds that the proposed Settlement Class satisfies the commonality requirement. Fed. R. Civ. P. 23(a)(2).

### C.  Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement ensures that the absent class members are adequately represented by the lead plaintiff such that the interests of the class will be fairly and adequately protected in their absence. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to

prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). The interests and claims of the lead plaintiff and the class members need not be identical to satisfy typicality and, provided the claims of the lead plaintiff and class members are based on the same legal or remedial theory, "differing fact situations of the class members do not defeat typicality." *Devaughn*, 594 F.3d at 1199.

Nevertheless, "it is well-established that a proposed class representative is not 'typical' under Rule 23(a)(3) if 'the representative is subject to a unique defense that is likely to become to become a major focus of the litigation.'" *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 599 (3d Cir. 2012). The reason why a lead plaintiff's unique defense is detrimental to the class is that the lead plaintiff "might devote time and effort to the defense at the expense of issues that are common and controlling for the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006).

To some extent, the Court agrees with National Roofing that, because the Sanchez Group purchased its Crocs shares through CFDs on a foreign exchange, the Sanchez Group may be subject to a unique defense. As noted above, to prevail on the merits of its claims, the Sanchez Group would be required show that the CFDs it purchased from Saxo Bank qualify as a "purchase or sale of a security *listed on an American stock exchange*." *Morrison*, 561 U.S. at 273 (emphasis added).[18] However, the Sanchez Group plausibly alleges that it suffered an injury as a result of Crocs' misrepresentations and that such conduct implicates the same set of concerns as the

---

[18]The *Morrison* decision was available to the Settling Parties during negotiations such that they could appropriately take this issue into account in determining the costs and benefits of settlement.

conduct alleged to have injured other members of the class.  The Sanchez Group seems to have sought to maximize recovery for all those who claim they suffered a loss because of Crocs' alleged misrepresentations and omissions.  Thus, the fact that the Sanchez Group may be subject to a statutory defense does not compromise the ability of the Sanchez Group to represent adequately the interests of the absent class members.  *See In re Am. Int'l Grp., Inc., Sec. Litig.*, 689 F.3d at 243-44 (noting that "Defendants in class action suits are entitled to settle claims pending against them on a class-wide basis even if a court believes that those claims may be meritless," provided that the class is properly certified under Rules 23(a) and (b) and the settlement is fair under Rule 23(e)); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 310 (3d Cir. 2011) (noting that mandating "that a class include only those alleging 'colorable' claims, [ ] would effectively rule out the ability of a defendant to achieve 'global peace' by obtaining releases from all those who might wish to assert claims").

Moreover, for the reasons discussed above, the addition of Messrs. Babbitt and Lundberg as class representatives generally cures the statutory defense issue.  *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 501 (S.D. Tex. 2004) (finding that class representative subject to statutory defense was not atypical of class because other class representative was not subject to statutory defense); *In re LILCO Sec. Litig.*, 111 F.R.D. 663, 673 (E.D.N.Y. 1986) ("the atypicality of any one representative for that subclass is minimized because all fourteen of the named plaintiffs are representatives").  National Roofing does not challenge the typicality requirement with respect to Messrs. Babbitt and Lundberg as class representatives and the Court is not otherwise aware that their ability to represent the class is compromised.

22

The Court concludes that the class representatives' interests are sufficiently aligned with the interests of the settlement class such that the fact that the Sanchez Group may be subject to a unique defense does not destroy the class representatives' ability to adequately protect the interests of absent class members.  *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009) ("A common thread running through the various components of typicality—the requirements of similarity of legal claims, factual similarity, and absence of defenses unique to the representative—is the interest in ensuring that the class representative's interests and incentives will be generally aligned with those of the class as a whole" (citation omitted)).

### D.  Adequacy of Representation

Rule 23(a)(4) requires that the class representative "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement protects the due process interests of unnamed class members who are bound by any judgment unless they opt out.  *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 379 n.5 (1996).

As the Supreme Court has noted, the "adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem*, 521 U.S. at 626 n. 20.  As such, the adequacy of representation "inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and

the class they seek to represent." *Id.* at 625.  Thus, to be an adequate class representative, the "representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id*. at 625-26.

The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002) (citation omitted).  Adequate representation depends on, among other factors, an absence of antagonism between the representatives and absentees, and a sharing of interest between representatives and absentees.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

With regard to the first adequacy factor, the Court finds that the interests of the class are fairly and adequately protected by the class representatives.  There is nothing in the record to indicate the Sanchez Group's susceptibility to a statutory defense raises a conflict of interest between itself and the rest of the class.  Moreover, there is nothing in the Settlement Agreement that raises obvious concerns regarding interclass conflicts. *See Amchem*, 521 U.S. at 611-12 (noting interclass conflict between the exposure-only asbestos plaintiffs and those already afflicted with asbestos related disease).  There is also no evidence that one set of class members will benefit from the settlement to the detriment of another set of class members.  Finally, despite the opportunity to do so, no class members challenged this issue at the fairness hearing.  *See In re Pet Food Prods. Liability Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) ("[O]bjectors fail to articulate any

conflict or adversity among class representatives and class members.  It is not enough

for objectors to point to differences in claims[ or] allocation amounts . . . without

identifying how such differences demonstrate a conflict of interest.").  Accordingly, the

Court finds that the class representatives are able to control the litigation and to protect

the interests of the class as a whole.

     With regard to the second adequacy factor, class counsel here are experienced

in complex class action litigation.  *See* Docket No. 26-5; Docket No. 26-4 at 53-60.

Class counsel have extensive experience acting as court-appointed lead or co-lead

counsel in securities class actions.  Docket No. 208 at 100-01.  In addition, neither

National Roofing nor any other class members question the competence of class

counsel or class counsel's ability to prosecute this action.  Accordingly, the Court

perceives no conflict of interest between the named plaintiffs and the rest of the class,

and class counsel has shown that it can vigorously litigate on behalf of the class.  The

Court finds that plaintiffs have satisfied Rule 23(a)(4)'s requirements.  *Rutter*, 314 F.3d

at 1188.

     **E.  Rule 23(b)(3)**

     To qualify for certification under Rule 23(b)(3), class questions must

"predominate over any questions affecting only individual members," and class

resolution must be "superior to other available methods for the fair and efficient

adjudication of the controversy."  *Amchem*, 521 U.S. at 615.  Rule 23(b)(3) states that

courts should consider the following factors when certifying a class: (A) the interest of

members of the class in individually controlling the prosecution or defense of separate

actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.  *See* Fed. R. Civ. P. 23(b)(3)(A)-(D).

Parallel with Rule 23(a)(2)'s commonality element, Rule 23(b)(3)'s predominance requirement imposes an obligation upon district courts to ensure that issues common to the class predominate over those affecting only individual class members.  *Sullivan*, 667 F.3d at 297.  However, the predominance criterion is "far more demanding" than Rule 23(a)(2)'s commonality requirement.  *Amchem*, 521 U.S. at 624.  Rule 23(b)(3)'s purpose is to "ensure[ ] that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007).  Thus, Rule 23(b)(3)'s predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation based on "questions that preexist any settlement."  *Amchem*, 521 U.S. at 623.  While predominance may be difficult to demonstrate in mass tort cases in which the "individual stakes are high and disparities among class members great," it is a "test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."  *Id.* at 625.

In this case, Plaintiffs, as well as absent class members, seek compensation for defendants' alleged material misrepresentations and omissions regarding Crocs'

inventory and management systems and therefore the test is readily met.  As an initial

matter, because the class claims are brought pursuant to federal law, there are no

issues concerning variations with state law.  Moreover, because the common questions

of fact and law depend entirely upon the conduct of defendants, these questions

predominate as they are unaffected by the particularized conduct of individual class

members.[19]

The Court also finds that a class action settlement is a superior method for

resolving this dispute.  *See Amchem*, 521 U.S. at 615.  Settlement avoids duplicative

litigation, saving both plaintiffs and defendants significant time and legal costs to

adjudicate common legal and factual issues.  In addition, settlement is appropriate

because recovery for these claims is likely too small to provide an incentive for

individual class members to adjudicate individual claims.  There is no indication that

similar litigation is currently pending in another forum related to the same time period

that would undermine the class certification requested by the Settling Parties.  There

are also no issues regarding interclass conflicts or disparate compensation methods as

---

[19]For example, as the Court has previously noted:

The common legal questions necessary to establish liability in this case
center around whether defendants made material misrepresentations or
omissions in violation of securities laws.  Similarly, the common questions of
fact involve when defendants made the alleged material representations,
whether defendants made the alleged misrepresentations with the requisite
scienter, and whether these alleged misrepresentations caused the class
damages.  Thus, because the answers to questions regarding defendants'
alleged misconduct and the harm caused by such misconduct are common
to all class members and inform the resolution of the litigation but for the
settlement, the Court finds that common issues of law and fact predominate
in this case.  *Sullivan*, 667 F.3d at 300.

Docket No. 204 at 21-22.

all class members will receive pro rata distribution of the Settlement Fund.  Thus, given that the class members' claims arise out of the same series of events, the Court finds that conducting the class action settlement in this forum would achieve economies of time, effort, and expense, and promote uniformity of decision to similarly situated persons.  Fed. R. Civ. P. 23(b)(3)(C); *Cordes*, 502 F.3d at 104.  Therefore, because the class members are identifiable, will receive the same relief, and have claims that present common questions of fact and law, the Court finds that class certification is appropriate because class questions predominate over individual questions and the settlement class is a superior method of resolving this litigation.  *Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud.").

## IV.  SETTLEMENT AGREEMENT

Rule 23(e) provides that a proposed settlement may only be approved after a "finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In this process, "trial judges bear the important responsibility of protecting absent class members" and must be "assur[ed] that the settlement represents adequate compensation for the release of the class claims."  *In re Pet Food Prods. Liab. Litig*., 629 F.3d 333, 349 (3d Cir. 2010); *see also Amchem*, 521 U.S. at 623 (noting that the Rule 23(e) inquiry "protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise" (citations omitted)).

To determine whether a proposed settlement is fair, reasonable, and adequate, courts consider the following factors: (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable. *Rutter*, 314 F.3d at 1188.  If the settling parties can establish these factors, courts usually presume that the proposed settlement is fair and reasonable.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (applying an "initial presumption of fairness" to a proposed settlement where: (1) it is the result of arm's length negotiations; (2) it is based on sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected).

The Court turns to the first factor.  There is no evidence that the Settlement Agreement was the result of a collusive agreement between the parties, and National Roofing does not suggest as much.  Although National Roofing contends that the timing of the Settlement Agreement raises doubts about whether it is in the best interest of class members, Docket No. 206 at 2, the Court cannot assume that Judge Phillips, a sophisticated mediator, was oblivious to the timing of the settlement.  The Settling Parties reached an agreement before a hearing took place in front of the Tenth Circuit; however, it appears they had engaged in extensive negotiations and mediation sessions for over a year.  Docket No. 206 at 5.  Moreover, the Settling Parties reached an agreement long after they completed appellate briefing, indicating an intent to fully

litigate the issues on appeal.  National Roofing has provided no reason for the Court to

conclude that the terms of the Settlement Agreement were not fairly and honestly

negotiated.  *Cf. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of*

*Am. v. Gen. Motors Corp.*, 497 F.3d 615, 634 (6th Cir. 2007) (noting that objectors need

to establish more than timing to indicate that the settlement was induced by collusion).

Although Plaintiffs had no opportunity to conduct formal discovery, Class Counsel

represents that the factual investigation focused on identifying former employees,

consultants, independent contractors and temporary employees of Crocs and

interviewing others with personal knowledge of the events that gave rise to plaintiffs'

claims.  Docket No. 208 at 7, ¶ 28.  The Court is therefore satisfied that the Settling

Parties reached an agreement only after fair consideration of the strengths and

weaknesses of their respective claims.  Accordingly, this factor weighs in favor of

approving the Settlement Agreement.

   As to the second factor, the Settlement Agreement seems to have been

negotiated against the backdrop of each party's likelihood of success on appeal.  Class

counsel appears well apprised of the risks of continuing to litigate this case.  *See*

*generally* Docket No. 208 at 37-42.  Assuming plaintiffs were successful on appeal,

there was nevertheless a risk that plaintiffs would be unable to establish the required

elements of their §10(b) claims, including that the alleged misstatements were

materially false and misleading, that defendants acted with scienter, and that the

alleged misstatements caused plaintiffs' damages.  Docket No. 206 at 6.  At the

fairness hearing, class counsel noted the difficulty of acquiring evidence to support

such a case.  Plaintiffs also had to consider their likelihood of success certifying a

relevant class, surviving summary judgment, and winning at trial. *See In re Qwest Commc'ns Int'l, Inc. Sec. Litig*, 625 F. Supp. 2d 1133, 1138 (D. Colo. 2009) ("The accounting issues, the scienter issues, the causation issues, and the damages issues all are complex and problematic.  Presenting these issues to a jury would create substantial risks for all parties, including the plaintiffs.").  Given the uncertainty surrounding the outcomes of the potential legal battles for both sides, the Court finds that the Settling Parties have sufficiently shown that there were questions of law and fact that raised doubts about the class' ability to recover should the litigation continue to trial.  Accordingly, the Court finds that this factor weighs in favor of approving the Settlement Agreement.

Next, the Court must determine whether the value of immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation. As discussed above, the Settlement Class is set to receive a cash payment of $10,000,000.00 based on a pro rata distribution of the Settlement Amount with an anticipated recovery of $0.13 per share of common stock purchased during the Class Period, minus expenses and fees.  National Roofing suggests that recovery of $6.4 million is insufficient for the Settlement Class, Docket No. 209 at 4,[20] but presents no

---

[20]National Roofing's suggestion that the Settlement is unfair because the Sanchez Group's own modest recovery reflects how much it has discounted its claims based on a lack of standing is without support.  According to Plaintiff's damages expert, the $10 million cash Settlement, assuming a 100% claim rate, represents a recovery of approximately 1.3% of the amount of damages that could be achieved, assuming recovery by the entire Settlement Class for the entire Settlement Class Period.  Docket No. 208 at 34.  According to a recent survey of securities class action settlements, this is in line with the median ratio of settlement size to investor losses.  *Id.* (citing Dr. Jordan Milev et al., *Recent Trends in Securities Class Action Settlements: 2011 Year – End Review* 17, 23 (NERA Econ. Consulting 2011)).

evidence showing that the Sanchez Group could have negotiated a higher Settlement Amount or that the class could secure a larger award after extensive litigation.  Given the uncertainty of plaintiffs' likelihood of success on the merits and the prospects of prolonged litigation, which would likely continue well beyond any judgment in plaintiffs' favor, the Court finds that immediate recovery in this case outweighs the time and costs inherent in complex securities litigation, especially when the prospect is some recovery versus no recovery.  *See Strougo v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (noting that it is "beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members." (quotation marks omitted)).  Accordingly, the Court finds this factor weighs in favor of approving the Settlement Agreement.

With regard to the fourth factor, it is evident that the Settling Parties believe that the Settlement Agreement is fair and reasonable.  The plaintiffs in this case are represented by experienced counsel who have extensive experience in litigating such matters.  Moreover, the settlement was the result of arm's length negotiations and was reached with the aid of experienced mediators.

The reaction of the class members further supports the conclusion that the Settlement Agreement is fair.  *See In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  Out of the approximately 300,000 notices sent to potential class members, only 13 putative class members opted out or expressed an intent to do so.  Docket No. 213 at 5; Docket No. 211.  After preliminary certification of the Settlement Class, only National Roofing and Mr. Encinosa objected, but neither objector attempted to explain why the proposed settlement was unfair under the Rule 23 factors.  Based

32

upon the foregoing factors, the Court concludes that the settlement is fair, reasonable, and adequate.

## V.  PLAN OF ALLOCATION

"'Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to the approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.'" *Law v. Nat'l Collegiate Athletic Ass'n*, 108 F. Supp. 2d 1193, 1196 (D. Kan. 2000) (quoting *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 183-84 (E.D. Pa. 2000) (internal quotation marks omitted).  "As a general rule, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable."  *Id.*

The Plan of Allocation is fully set forth in the Notice.  Plaintiffs contend that the division of proceeds is "based upon the formula that results in Plaintiffs' best possible damages assuming success on the merits for all claims of the Settlement Class Members at the various different junctures during the Settlement Class Period."  Docket No. 208 at 42-43.  As noted above, the estimated average recovery will be approximately $0.13 per share of Crocs' common stock before deduction of Court-approved fees and expenses.  Docket No. 194-2 at 2.  After the deduction of fees and expenses, the Settlement Fund will be allocated pro rata among the Settlement Class based on the following factors: (1) the date class members purchased securities; (2) the type of security purchased; (3) the first-in first-out ("FIFO") method of recognized loss; and (4) the Recognized Claim formula.  Docket No. 194-2 at 11-16.  The Recognized Claim formula helps to determine the basis upon which the Settlement

Fund will be proportionally allocated and is based on consultation with plaintiffs' experts, the relative strengths and weaknesses of the Settlement Class claims, and the impact of the alleged misconduct by the Settling Defendants on the price of Crocs' securities at various times during the Settlement Class Period.  Docket No. 208 at 70.  The Plan of Allocation indicates that, after the initial distribution, any remaining balance shall be reallocated and distributed among the class members who can receive at least $10.00 from such re-distribution.  Docket No. 194 at 26, ¶ 6.2(c).

Class counsel appears properly apprised of the merits of all claims as relevant to the Plan of Allocation and counsel further contends that the Plan of Allocation is fair and reasonable.  *See generally* Docket No. 208 at 42-45; *see also Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.").  There is no evidence or allegations of collusion during the preparation of the Plan of Allocation.  Plaintiffs represent that they have consulted with damages experts and indicate that the Plan of Allocation reflects the same formulas and reasoning that would have been used to show the Settlement Class members' damages at trial.  Docket No. 206 at 9.  The Plan of Allocation also provides for the redistribution of remaining funds.  *See In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 262 (D.N.H. 2007) (finding that redistribution of unclaimed funds weighed in favor of approving plan of allocation).  There is no indication that the Plan of Allocation favors certain class members at the expense of others and no class member

has objected to the Plan of Allocation.[21]  *See Maley*, 186 F. Supp. 2d at 367 ("the

favorable reaction of the Class supports approval of the proposed Plan of Allocation").

Moreover, the Court finds that the $10.00 threshold for payment from the Net

Settlement Fund is proper in order to "preserve the settlement fund from excessive and

unnecessary expenses."  *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436,

463 (S.D.N.Y. 2004) ("Lead Counsel acted reasonably in including a $10 de minimis

threshold in the allocation plan").  The Court concludes that the Plan of Allocation

reimburses class members based on the extent of their injuries and is otherwise fair,

reasonable, and adequate.  *Cf. In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y.

2012) (analyzing favorably plan of allocation that divided settlement class period into

two parts: (1) shares purchased during a time period affected by corrective disclosures,

which were assigned an inflation factor to reflect the entire drop in share price and (2)

shares purchased subsequent to the drop in price, which were assigned no inflation

factor, rendering such claims worthless).

## VI.  NOTICE TO THE SETTLEMENT CLASS

Under Rule 23(e)(1), a district court approving a class action settlement "must

direct notice in a reasonable manner to all class members who would be bound by the

proposal."  Fed. R. Civ. P. 23(e)(1).  Rule 23(c)(2)(B) provides, in relevant part, that for

"any class certified under Rule 23(b)(3), the court must direct to class members the best

notice that is practicable under the circumstances, including individual notice to all

---

[21]The Court construes Mr. Encinosa's objection as an objection to his potential
personal recovery under the Plan of Allocation.  Mr. Encinosa does not contend that the
Plan of Allocation is unfair, unreasonable, or inadequate for the Settlement Class as a
whole.

members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). In addition to the requirements of Rule 23, the Due Process Clause also guarantees unnamed class members the right to notice of a settlement. *DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 943-44 (10th Cir. 2005).  However, due process does not require that each class member receive actual notice to be bound by the adjudication of a representative action. *Id*.  Instead, the procedural rights of absent class members are satisfied so long as "the best notice practicable [is given] under the circumstances including individual notice to all members who can be identified through reasonable effort." *In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1110 (10th Cir. 2001) (citation omitted).  Thus, the legal standards for satisfying Rule 23(c)(2)(B) and the constitutional guarantee of procedural due process are coextensive and substantially similar. *DeJulius*, 429 F.3d at 944.

The Settling Parties made reasonable efforts, as set forth above, to identify potential members of the settlement class and provided nearly 300,000 Claim Packets to potential class members.  Docket No. 218 at 3, ¶ 8.  In addition, Plaintiffs sent out press releases over PR Newswire on September 12, 18, and 24, 2014.  Docket No. 208 at 87-89.  The Notice itself provided class members with information regarding the anticipated recovery under the partial Settlement Agreement, the outcome of the case without a settlement, the agreement on the amount of damages, reasons for the settlement, the amount of attorneys' fees or costs sought, and a summary of the plan of allocation. *See* Docket No. 208 at 65-85; 15 U.S.C. § 78u-4(a)(7); Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).  The fact that, as of February 20, 2014, approximately 29,400 claims

had been received is further evidence that the Notice was successful in fairly apprising class members of the terms of the proposed settlement and of their options for collecting, objecting, or opting out.  Based on the foregoing, the Court is satisfied that the Notice was reasonably calculated to apprise the absent class members of the action.  *See In re Integra*, 262 F.3d at 1111.

## VII.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Motion for Final Approval of Proposed Partial Class Settlement, Plan of Allocation, and Final Certification of Settlement Class [Docket No. 206] is **GRANTED**.  The Court will issue a separate order setting forth the terms of the final judgment and partial dismissal with prejudice.

DATED September 18, 2014.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge